```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ERIC TOLLIVER,                                              :

                         Plaintiff,                         :

       -against-                                            :    REPORT and RECOMMENDATION[1]

ROBERT ERCOLE, SUPERINTENDENT,                              :    08 Civ. 4023 (DAB)(KNF)
SR. NAR. INV. THOMAS WALSH, D.S.P.
CUNNINGHAM,                                                 :

                         Defendants.                        :
------------------------------------------------------------x
```

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

In this pro se action, brought pursuant to 42 U.S.C. § 1983 ("§ 1983"), Eric Tolliver ("Tolliver"), an inmate at the Green Haven Correctional Facility, seeks relief against Superintendent Robert Ercole ("Ercole"); Thomas Walsh ("Walsh"), the "I.G. Investigator"; and D.S.P. Cunningham ("Cunningham"), a disciplinary hearing officer, for violating his right to due process, in connection with a hearing held for a misbehavior report dated March 3, 2008. In the amended complaint, the plaintiff alleges his right to a "fair and impartial hearing" was violated when Cunningham and Walsh: (1) conspired to withhold "information about confidential testimony"; (2) delayed the plaintiff's hearing until the plaintiff's "most important witness," Prudence Wisdom, was deported to another country and was thus unavailable to testify at the plaintiff's hearing; and (3) "ke[pt] the plaintiff misinformed until the end of the hearing" about

---

[1] The Report and Recommendation dated September 8, 2009, which has not been docketed, is amended solely to reflect the correct docket number.

the existence of a transcript of four tape recordings that allegedly captured conversations between the plaintiff and his co-conspirators. The plaintiff alleges Cunningham and Walsh were involved in a conspiracy to deny him a fair and impartial hearing. The plaintiff asserted that, as a result of the defendants' conduct, his cholesterol level increased, he experienced stress and weight loss, and he was placed on a controlled diet by "the medical department." By way of relief, the plaintiff seeks dismissal of all charges against him, restoration of visiting privileges for "all of [his] visitors"; restoration of all of the privileges the plaintiff had before being placed in the Special Housing Unit ("SHU"); and payment of $150 for each day he is housed in SHU as punishment for the charges in the misbehavior report at issue.

Before the Court is the defendants' motion to dismiss the plaintiff's complaint, pursuant to Fed. R. Civ. P. 12(b)(6). The defendants contend dismissal is appropriate because Tolliver failed to: (1) exhaust his administrative remedies; (2) allege personal involvement by Ercole and Walsh in any constitutional violation; (3) demonstrate a violation of his due process rights; and (4) state a claim for conspiracy. The defendants also allege that Walsh and Cunningham are entitled to qualified immunity.

Also before the Court is the plaintiff's motion to "grant[] [his] complaint and oppos[e] . . . the defendants' motion to dismiss." In support, the plaintiff alleges: (1) he exhausted his administrative remedies, as evidenced by the attached copies of the responses he received to his grievances; (2) he asserted adequately the personal involvement of Ercole and Walsh, in the violation of his right to due process and the existence of a conspiracy; and (3) qualified immunity does not bar suit against Walsh and Cunningham, since the defendants are sued in their official and individual capacities, for equitable and monetary damages.

The motions are analyzed below.

## II.  BACKGROUND AND PROCEDURAL HISTORY

In the amended complaint, the plaintiff alleges that, on March 3, 2008, he was removed from his cell, placed in SHU, and was served a misbehavior report, stating Tolliver was involved in an incident occurring on January 3, 2008.  The plaintiff requested a tier assistant to help him acquire "all paperwork[] having to do with [his] case," and the tier assistant provided Tolliver with a "printout of [the plaintiff's] home phone list."  Although the plaintiff requested additional assistance, in accessing documents related to his misbehavior report, his tier assistant did not perform any additional tasks for him.

On March 11, 2008, the plaintiff was summoned to a hearing before Cunningham.  At the hearing, the plaintiff complained that he lacked paperwork related to his misbehavior report, Cunningham disclosed that he also lacked supporting documentation, and Cunningham stated he was going to grant an extension of time to conduct the hearing.  Tolliver objected because he would be kept in SHU pending the conclusion of the hearing.  The plaintiff "was then sent back to [his] cell."  On March 12, 2008, Tolliver attended another hearing, at which he objected to: (1) the extension granted at his previous hearing; (2) the timeliness of the misbehavior report, since it was dated approximately 2 months after the date of the incident for which it was written; (3) the content of the misbehavior report, since it was vague and did not specify where the incident occurred; and (4) the misbehavior report, as it provided an "inadequate notice of the charges."  According to Tolliver, Cunningham telephoned the author of the misbehavior report, Walsh, who "testified on speaker phone" that tape recordings and a transcript of the tape recordings existed supporting the charges in the misbehavior report.  Tolliver alleges Walsh

3

explained that four inmates and three "outside visitors" conspired with Tolliver to bring contraband into Tolliver's correctional facility. The plaintiff requested that he be provided with all paperwork relating to the misbehavior report, and he was returned to his cell.

On March 18, 2008, Tolliver received an "unusual incident report" ("UIR") and a new "disciplinary hearing extension request," both of which appeared defective to him. Notably, the UIR did not state Tolliver's correct cell location, since it contained the cell location of another inmate whose last name was also Tolliver; and the UIR was not prepared until two weeks after the incident discussed therein occurred. As to the disciplinary hearing extension request, Tolliver found it to be defective, because it stated Tolliver and an inmate named "Bonner" were both the subject of the extension request. Tolliver lodged these objections at his next hearing, held on March 19, 2008. Tolliver also informed Cunningham that an order of removal had been issued against Prudence Wisdom, and she was going to be deported to Jamaica. Therefore, Tolliver urged Cunningham "to get her testimony first before all other witnesses because she is the only . . . witness . . . that was charge[d] with conspiracy with [Tolliver], and she is the only one of [his] witness[es] that can testif[y] about what happen[ned] outside the facility the day of 1/31/08, when she came up to visit [him]." Cunningham "call[ed] all [of] the inmate[] witnesses first," each of whom testified he had never been asked by Tolliver to "go on the visit and bring back any kind of drugs in[to] the facility." Cunningham provided Tolliver with a new hearing extension form, seeking an extension of the proceeding in order to obtain testimony from inmates who had been transferred to another facility. Tolliver alleges the reason proffered for the extension was "false," because the only witness who had been transferred had already testified.

On March 30, 2008, Tolliver was given four cassette tape recordings alleged to contain

4

conversations implicating Tolliver in bringing contraband into the correctional facility. According to Tolliver, the tapes did not contain any information to this effect. Tolliver was not removed from his cell for another hearing until April 8, 2008. Tolliver contends this delay was intentional, so that Wisdom's deportation to Jamaica could be effected before she could testify at the hearing. Tolliver maintains that Walsh and/or Cunningham "lied" to him about the existence of a transcript of the four cassette tapes to which Tolliver had listened since, during Tolliver's questioning of Walsh, toward the conclusion of his hearing, he testified that no transcripts existed. Cunningham ultimately stated that, because he did not "understand what [Tolliver] was talking about on the tapes, . . . he will not be using the tapes in his evidence relied on, in his disposition." When Tolliver asked Walsh about Juliet Taylor–an "outside visitor" on the day of the incident, who was charged with second degree promotion of prison contraband–Walsh responded that he did not want to talk about her.

     Tolliver called his tier assistant to testify as a witness. He asked her why she "lied" about the existence of an unusual incident report, and Cunningham interrupted and stated the tier assistant did not have to answer the question. Cunningham directed Tolliver to refrain from asking her "anything about her assistance to [him]." Tolliver gave his tier assistant a letter she had written to Tolliver; Tolliver asked her to read it. Cunningham took the letter from the tier assistant, instructed her not to answer the question, and informed her she could "go now." Tolliver contends Cunningham's behavior violated his right to due process and to present witnesses.

     Before the hearing concluded, Tolliver called Wisdom to testify, and Cunningham called an officer, who informed Tolliver that he "tried to locate [Wisdom] but could not find her."

Tolliver objected to the hearing, and for the delay that caused Wisdom to be deported, before she could testify on his behalf. After a brief recess, Cunningham announced "his decision and gave [Tolliver] copies of his decision," and Tolliver was returned to his cell. Tolliver filed a grievance regarding his claims; however, a grievance procedure did not exist that covered his claims.

In support of his claim that he exhausted his administrative remedies, Tolliver attached to his motion copies of documents demonstrating his efforts to exhaust those remedies. Tolliver maintains that he filed a grievance, with the Inmate Grievance Committee at the Green Haven Correctional Facility, "on all these issues," and, on April 24, 2008, he received a form from a "Supervisor." Tolliver attached to his motion a copy of this form, which states Tolliver's "grievance is being returned . . . for the following reason(s): . . . According to Directive 4040 Inmate Grievance Program, 701.3 General policies . . . (e)(1) An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable." Tolliver then wrote a letter to Ercole, dated April 28, 2008, requesting that, if a decision on the merits of his grievance was not forthcoming, he desired to have all his grievance materials returned to him. According to Tolliver, he did not receive a response to this letter. Tolliver alleges he then filed an appeal with "the Albany Office," and, when he did not receive a response "for some time," he began to file grievances indicating his mail was either not being dispatched, or his incoming mail was not being forwarded to him.

In July 2008, Tolliver received a letter from the Department of Correctional Services, stating that, pursuant to directive 4040, the "Inmate Grievance Program . . . provides inmates with an orderly, fair, simple and expeditious method of resolving grievances pursuant to the

6

Correction Law. The directive makes no provision for an inmate to refer grievances directly to Central Office." The letter advised Tolliver to "submit [his] grievance or appeal directly to the IGRC Clerk at the facility."

### III.  DISCUSSION

When considering a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Staehr v. Hartford Fin. Services Group, Inc., 547 F.3d 406, 424 (2d Cir. 2008). At the pleading stage, no obligation exists to prove anything, only to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); see also Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (citing and endorsing Twombly's "plausible on its face" standard). Additionally, when assessing a motion pursuant to Fed. R. Civ. P. 12(b)(6), "consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated . . . by reference, and to matters [about] which judicial notice may be taken," Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991), as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit," Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (internal citation omitted).

Exhaustion of Administrative Remedies

The instant action was brought pursuant to § 1983, to redress alleged constitutional violations. However, a prisoner's ability to initiate a § 1983 action is constrained by 42 U.S.C. § 1997e, as amended by the PLRA.

42 U.S.C. § 1997e(a) provides, in relevant part, that:

> No action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

"[A] prisoner must exhaust his or her administrative remedies prior to filing a claim under § 1983." Richardson v. Goord, 347 F.3d 431, 434 (2d Cir. 2003).

The New York State Department of Correction's ("DOC") grievance process is composed of three tiers: (1) a grievance is filed with, and reviewed by, the Inmate Grievance Resolution Committee ("IGRC"); (2) an appeal is taken from the IGRC decision, to the superintendent of the facility; and (3) an appeal is taken from the superintendent's decision, to the Central Office Review Committee ("CORC"). See Hemphill v. New York, 380 F.3d 680, 682 (2d Cir. 2004). Complete exhaustion is required. See Richardson, supra.

The Second Circuit has held that, when the issue of exhaustion is raised as a defense, and the plaintiff provides a plausible explanation to counter this defense, district courts should follow a three-step inquiry, analyzing whether: (1) administrative remedies were "available" to the plaintiff; (2) the defendant(s) waived the failure-to-exhaust defense, by failing to raise or preserve it; and (3) any "special circumstances" exist, justifying a prisoner's failure to exhaust his administrative remedies. See Hemphill, 380 F.3d at 686.

In Giano v. Goord, 380 F.3d 670 (2d Cir. 2004), Giano, a prisoner housed in a New York State prison, filed a § 1983 complaint, alleging prison officials tampered with evidence that was presented at a disciplinary hearing, as an act of retaliation. Giano did not file a grievance to exhaust his retaliation claim; rather, Giano stated that, since he was prohibited from filing a grievance based upon prison regulations and "DOCS Directive 4040, which state[s] that

8

disciplinary decisions and dispositions are non-grievable," he exhausted his administrative remedies by appealing the disciplinary hearing decision. Id. at 674. The Second Circuit found that Giano's failure to "exhaust available administrative remedies before filing suit . . . was justified by his reasonable belief that DOCS regulations [specifically, DOCS Directive 4040] foreclosed such recourse." Giano, 380 F.3d at 678.

In his amended complaint, Tolliver states he: (a) filed a grievance with the "facility grievance committee"; and (b) appealed to Ercole, the superintendent. In his motion to grant his complaint and oppose the defendants' motion, Tolliver specified that he filed a grievance "on all these issues," raised in his federal complaint, to the IGRC, he received a response that his issues were non-grievable. A review of the documents Tolliver attached to his motion, see Rothman, 220 F.3d at 88-89, demonstrates that Tolliver received a document from the "Inmate Grievance Program," returning a grievance to Tolliver because it was non-grievable, pursuant to, inter alia, directive 4040.

Following the rationale of Giano, and taking the plaintiff's contentions as true and drawing all reasonable inferences in his favor, it appears administrative remedies were not "available" to the plaintiff, since Tolliver was told his concerns were "non-grievable" pursuant to directive 4040. The defendants assert that "there is no way to determine that the notice dated April 24, 2008 plaintiff received from the Inmate Grievance Program ("IGP") advising him that his issues were non-grievable was even related to the grievance he alleges he attempted to file or the issues raised in this action." This assertion militates against granting the motion to dismiss for failure to exhaust, since, at this juncture, the Court must draw all reasonable

9

inferences in the plaintiff's favor, see Staehr, 547 F.3d at 424, which includes an inference that, as the plaintiff alleges, he presented the issues raised in this action to the IGP and was informed that such issues were not grievable.  To the extent the defendants assert that the plaintiff was still obligated to grieve his claims, despite receiving the IGP document stating that his claims were non-grievable, the reasoning of Giano dictates that a prisoner's failure to "exhaust available administrative remedies before filing suit . . . was justified by his reasonable belief that DOCS regulations [specifically, DOCS Directive 4040] foreclosed such recourse."  Giano, 380 F.3d at 678.  Here, the plaintiff was advised specifically that DOCS Directive 4040 foreclosed his use of the three-tier grievance process.  Therefore, it is inappropriate and unreasonable to grant the defendants' motion for dismissal on the basis of the plaintiff's failure to exhaust administrative remedies.[2]

Personal Involvement

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Johnson v.

---

[2] The Second Circuit Court of Appeals found, in Giano, 380 F.3d 670, that Giano had exhausted his administrative remedies by appealing the disciplinary hearing decision.  The defendants do not allege that the plaintiff did not exhaust his claims by failing to appeal the disciplinary hearing decision, and, instead, argued that, "[t]o the extent th[e] plaintiff claims that mentioning some of the unexhausted claims in his disciplinary appeals excused his failure to grieve and exhaust the underlying facts of the claims raised in this action, that argument has been expressly rejected by the Second Circuit."  In support, the defendants make citation to Macias v. Zenk, 495 F.3d 37 (2d Cir. 2007).  However, Macias is distinguishable from the present case, since the petitioner in Macias alleged he exhausted his administrative remedies by "informally" grieving his claims, while Tolliver alleges he exhausted his administrative remedies, since he filed a grievance and was informed his matters were not grievable pursuant to directive 4040.  As such, the rationale of Giano, a case in which the facts mirror the facts of the present case, should control.

Newburgh Enlarged School District, 239 F.3d 246, 254 (2d Cir. 2001)(quoting Colon v. Coughlin, 58 F.3d 865, 873 [2d Cir. 1995]) (internal quotations omitted).  In order to demonstrate personal involvement by a supervisory defendant, the plaintiff may present evidence showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873.

Tolliver's amended complaint contains sufficient allegations of Cunningham's personal involvement, through his conduct as the hearing officer, and Walsh's, through his preparation of the misbehavior report against Tolliver, and participation, as a witness, at Tolliver's hearing. As to Ercole, his name does not appear in the amended complaint, and there do not appear to be any allegations in the amended complaint pertaining to Ercole.  Therefore, since Tolliver has not alleged personal involvement by Ercole in the alleged constitutional deprivations, the motion to dismiss as it pertains to Ercole, should be granted.  See e.g., Hernandez v. Goord, 312 F. Supp. 2d 537, 547 (S.D.N.Y. 2004) (dismissing the complaint against a defendant since the "[p]laintiff fails to allege any specific claim of personal involvement against [the defendant]; indeed, he does not mention him at all in the body of the complaint but for including his name in a lengthy list of defendants").

11

Due Process

      To state a claim, under § 1983, that due process was denied to him at a disciplinary hearing, the plaintiff must show: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (internal quotations marks and citations omitted). To satisfy the first prong, a prisoner asserting he was denied due process, in connection with a prison disciplinary hearing that resulted in segregative confinement, "must make a threshold showing that the deprivation of which he complains imposed an 'atypical and significant hardship on [him] in relation to the ordinary incidents of prison life.'" Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (quoting Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300 [1995]). In determining whether a prisoner has a protected liberty interest in freedom from disciplinary confinement, under due process principles, a court must examine the specific circumstances of the punishment, including the difference between disciplinary segregation conditions and ordinary prison conditions, as well as the duration of the disciplinary segregation imposed. See Sims, 230 F.3d at 22. "Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous." Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). In Sandin, the Supreme Court found that 30 days of disciplinary segregation did not constitute "atypical and significant hardship," Sandin, 515 U.S. at 486, 115 S. Ct. at 2301, while the Second Circuit Court of Appeals has "characterized segregative sentences of 125-288 days as 'relatively long,' and thus necessitating 'specific articulation of . . . factual findings' before the district court could properly term the confinement atypical or insignificant." Sims v. Artuz, 230 F.3d at 23

12

(quoting Hynes v. Squillace, 143 F.3d 653, 658 [2d Cir. 1998]).

As to the first prong, neither party states definitively how long Tolliver has been held in SHU as a result of the disciplinary proceeding at issue.  However, in requesting monetary damages in his amended complaint, Tolliver states he wishes to receive $150 "for each day I am locked up in the SHU box," which suggests that he is still housed in SHU.  According to the amended complaint, Tolliver was housed in SHU beginning on March 3, 2008, when he was first served with a misbehavior report, and continues to reside there.  A document attached to the defendants' memorandum of law, stating the charges against Tolliver and the penalties levied against him, after finding him guilty, provides that Tolliver was sentenced to 547 days in SHU, and lost his privileges to packages, "comm," and telephone usage.  Since sufficient facts exist, upon which the Court may rely to find – drawing all reasonable inferences in Tolliver's favor – that he has been housed in SHU for over 500 days and has lost various privileges, the Court finds further that Tolliver's SHU confinement appears to be atypical and significant.  See, e.g., Tellier v. Fields, 280 F.3d 69, 80 (2d Cir. 2000) (finding that, where an inmate alleged "confinement of 514 days [in SHU] under conditions that differ markedly from those in the general population [due to the loss of privileges,] . . . we cannot conclude as a matter of law that this confinement was not 'atypical and significant'").

Since it appears that Tolliver has a liberty interest, the Court turns to the second prong in analyzing Tolliver's due process claim: whether the defendants "deprived him of that interest as a result of insufficient process." Selsky, 238 F.3d at 225 (internal quotations marks omitted).  The minimum procedural requirements to satisfy due process, in the context of an inmate's

disciplinary proceeding, include:

> (a) written notice of the claimed violations . . . ; (b) disclosure to the [inmate] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body . . . ; and (f) a written statement by the factfinders as to the evidence relied on and reasons for [the decision].

Wolff v. McDonnell, 418 U.S. 539, 559, 94 S. Ct. 2963, 2976 (1974) (citing Morrissey v. Brewer, 408 U.S. 471, 489, 92 S. Ct. 2593, 2604 [1972]); see also Kalwasinski v. Morse, 201 F.3d 103, 108 (2d Cir. 1999) (noting that "Wolff's protections apply to an inmate facing SHU confinement and that an inmate has a right to a fair and impartial hearing officer").  The Supreme Court has held that "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense."  Furthermore, a "brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance [at] the [disciplinary hearing]."  Wolff, 418 U.S. at 564, 94 S.Ct. at 2979.

Tolliver alleges: (i) the misbehavior report he was given contained an incorrect date-of-incident; (ii) his tier assistant did not obtain any paperwork on the charges against him – aside from a "home phone list"; and (iii) the report did not specify where – within the correctional facility – the incident occurred.  In addition, the report provided "no information . . . about the names of [Tolliver's] alle[ged] coconspirators, both inmates, and outside visitors," and when Tolliver appeared for a hearing one week after he was first given the misbehavior report, the hearing had to be postponed, because neither Cunningham nor Tolliver had the requisite

paperwork or "any evidence" for the hearing.  Tolliver asserted that the deficient incident report was written by Walsh.  At his hearing, Tolliver objected to the incident report because it did not give him "adequate notice of the charges."  Taking these allegations as true, and drawing all reasonable inferences in Tolliver's favor, Tolliver's amended complaint appears to allege adequately that he did not receive "written notice of the claimed violations," as that term is defined in Wolff: "written notice . . . [that] inform[s] [the inmate] of the charges . . . to enable him to marshal the facts and prepare a defense."  Wolff, 418 U.S. at 564, 94 S. Ct. at 2979.  Additionally, Tolliver's allegations call into question whether he was afforded a "brief period of time after the notice, no less than 24 hours, . . . to prepare for the appearance [at] the [disciplinary hearing]," and whether adequate disclosure of the evidence against him was made.  Id. at 564, 559, 94 S. Ct. at 2979, 2976.

As Tolliver has alleged sufficient facts from which the Court can infer that he has a liberty interest, and the minimum procedural requirements of due process may not have been met by Walsh and Cunningham, it would be inappropriate for the Court to recommend that the defendants' motion to dismiss be granted, on the basis that Tolliver failed to state a claim that his due process rights were violated.

Conspiracy

In order to establish a § 1983 conspiracy claim, a plaintiff must demonstrate: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on him; and (2) "an overt act [was] done in furtherance of that goal causing damages."  Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  "[C]omplaints

containing only 'conclusory,' 'vague,' or 'general allegations' of a conspiracy to deprive a person of constitutional rights will be dismissed." Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977).

Tolliver asserts that Walsh represented falsely that transcripts of the four cassette recordings exist, and alleged Cunningham engaged in bad conduct, during Tolliver's disciplinary hearing, by: (a) seeking a series of extensions based upon false bases, (b) failing to call Wisdom as a witness until after she was deported, and (c) curtailing Tolliver's questioning of his tier assistant at the hearing. Beyond these allegations, Tolliver alleges, in a conclusory fashion, that Walsh and Cunningham conspired to: (1) withhold "information about confidential testimony," (2) delay the proceeding, (3) mislead the plaintiff, by stating transcripts of the tape cassette recordings exist, and by suppressing unidentified evidence and distorting unidentified testimony, and (4) "keep the plaintiff misinformed until the end of the hearing." However, these vague and conclusory allegations are insufficient to state a § 1983 conspiracy claim, see Ostrer, 567 F.2d at 553, and do not show either (a) an agreement between Walsh and Cunningham to act in concert to inflict an unconstitutional injury on Tolliver existed, or (b) an overt act was performed in furtherance thereof, see Pangburn, 200 F.3d at 72. Accordingly, it appears reasonable and appropriate to grant the defendants' motion to dismiss Tolliver's conspiracy claim.

Qualified Immunity

The doctrine of qualified immunity shields government officials from civil actions for damages for discretionary acts performed in the course of their duties "insofar as their conduct

16

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  In determining whether qualified immunity bars a suit against government officials, a court must consider: (1) whether the facts demonstrate that a constitutional right was violated; and (2) whether the officials' actions violated a right that was clearly established.  Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155 (2001).  "Because the two-step Saucier procedure is often, but not always, advantageous, the judges of the district courts . . . are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case."  Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 821 (2009).  "[A] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful."  Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotations and citations omitted).  "[Q]ualified immunity is an affirmative defense [and] the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time."  Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir. 1997).

     As set forth above, the plaintiff made sufficient allegations that his Fourteenth Amendment right to due process may have been violated by the inadequate notice of the charges against him, and the manner in which his disciplinary hearing was conducted.  However, Walsh and Cunningham failed to meet their burden of demonstrating that their conduct, as to this claim, did not: (i) violate the plaintiff's clearly established rights; or (ii) consist of actions a reasonable

17

officer would have known were violative of clearly established law. See e.g., Palmer v. Richards, 364 F.3d 60, 67 (2d Cir. 2004) (finding that, whether an inmate's liberty interest was clearly established depended upon whether the duration and conditions of SHU confinement infringed a liberty interest, and whether a reasonable correctional facility employee should have known, in light of Sandin and Second Circuit Court of Appeals' case law, that the inmate's liberty interests were "at stake"); Hanrahan v. Doling, 331 F.3d 93, 99 (2d Cir. 2003) (finding that "a credible argument [cannot] be made, that it was not clearly established . . . that disciplinary punishment, consisting of [a sentence of] ten years of solitary confinement [of which the inmate actually served a 335-day sentence], triggered due process protection"); Quartararo v. Catterson, 73 F. Supp. 2d 270, 273 (E.D.N.Y. 1999) ("as pointed out by the Second Circuit, 'the minimal procedural due process requirements of notice and reasons for terminating a protected liberty interest have long been established.'") (quoting Tracy v. Salamack, 572 F.2d 393, 395-96 [2d Cir. 1978]). Accordingly, the doctrine of qualified immunity does not shield Walsh and Cunningham from suit on the plaintiff's due process claim.

Motion to "Grant the Complaint"

To the extent the plaintiff moves for the Court to "grant [his] complaint," based on the current record, the Court lacks the requisite information to determine whether the plaintiff is entitled to the relief he seeks. Therefore, recommending positive action on the plaintiff's request is, at this juncture in the proceedings, premature.

## IV. RECOMMENDATION

For the reasons set forth above, the defendants' motion to dismiss, Docket Entry No. 9,

should be granted, in part, in relation to the plaintiff's conspiracy claim, and denied, in part, in relation to the plaintiff's due process claim. The plaintiff's motion, to "grant his complaint," Docket Entry No. 13, should be denied, as premature.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Batts. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
September 9, 2009

Respectfully submitted,

_Kevin Nathaniel Fox_
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Eric Tolliver
Maria Barous Hartofilis, Esq.